UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GÖKÇE GÜVEN,<br><br>          Defendant. | **SUPERSEDING INDICTMENT**<br><br>S2 25 Cr. 592 (LAK) |

**COUNT ONE**

**(Securities Fraud)**

The Grand Jury charges:

1.      From at least in or about 2024 up to and including at least in or about November 2025, GÖKÇE GÜVEN, the defendant, engaged in a scheme to defraud the investors of Kalder Inc. ("Kalder"), a company that she founded and led as Chief Executive Officer ("CEO"). While raising money from venture capital investors as part of Kalder's "seed round," GÜVEN falsely represented Kalder's business success and prospects through lies about Kalder's financials, brand partners, and paying customers. GÜVEN overstated Kalder's annual recurring revenue—a financial metric that reflects predictable (recurring) income generated through subscriptions—by nearly tenfold. GÜVEN also falsely represented that Kalder had dozens of paying customers. In truth, and as GÜVEN knew, Kalder had minimal revenue, recurring or otherwise, and few paying customers. GÜVEN raised approximately $7 million from "seed round" investors in exchange for equity interests in Kalder.

2.      GÖKÇE GÜVEN, the defendant, also used lies about Kalder to obtain an immigration benefit. GÜVEN, who is a Turkish national, developed Kalder while in the United States on a student visa. As her student visa reached expiration, GÜVEN used false statements

about Kalder's success, among other lies, to fraudulently obtain a visa that would allow her to remain in the United States indefinitely. Specifically, in 2025, GÜVEN caused Kalder to sponsor her for an O-1A visa, colloquially known as a "genius visa," which is issued to individuals with extraordinary ability in the sciences, education, business or athletics. GÜVEN's visa application repeated the same sorts of misrepresentations that GÜVEN had provided to Kalder's investors, including that Kalder had more than $1.2 million in annual recurring revenue and dozens of paying customers. As part of her application, GÜVEN also supplied letters of support and reference purportedly signed by business executives but that, in fact, GÜVEN had forged and digitally signed herself without the executives' knowledge or consent. Based on a visa application that contained these material misrepresentations and forgeries, GÜVEN was ultimately issued an O-1A visa in the fall of 2025.

### GÜVEN's Scheme to Defraud Investors

3. GÖKÇE GÜVEN, the defendant, was the founder and CEO of Kalder, a New-York based technology startup focused on business loyalty and rewards programs. GÜVEN created Kalder in 2022, raising $3 million for the business in a pre-seed investment round. She promoted Kalder as a "fintech-marketing platform" that brands could use to create and monetize customized rewards programs. According to GÜVEN, brands could embed cash-back and rewards programs directly into their websites, thereby increasing customer engagement and spending.

4. Through Kalder, GÖKÇE GÜVEN, the defendant, generated significant publicity for herself, particularly in the technology and startup space. GÜVEN spoke on panels, attended networking events, and was named to the *Forbes* "30 Under 30" list for Marketing and Advertising in late 2024 after touting Kalder to the magazine. Publicly, and to potential investors and brand partners, GÜVEN boasted of rapidly growing brand partners and increasing revenue for the

business. In reality, and as GÜVEN knew, Kalder's business was not gaining traction. The company had few brand partners paying for Kalder's purported services and little actual revenue.

5.  In April 2024, GÖKÇE GÜVEN, the defendant, began raising Kalder's seed round, soliciting investments from dozens of venture capitalists, including investors based in Manhattan. By late 2024, GÜVEN had raised approximately $7 million from more than a dozen investors. In soliciting these investments, GÜVEN provided prospective investors with false statements, misleading claims, and fabricated documents regarding Kalder's revenue and brand partners.

6.  For instance, beginning in or around April 2024, GÖKÇE GÜVEN, the defendant, prepared and transmitted to potential investors a pitch deck for Kalder that misrepresented, among other things, the status of Kalder's business partnerships. In the pitch deck, GÜVEN represented that Kalder had 26 brands "using Kalder" and 53 brands in "live freemium" (that is, using basic Kalder services free of charge). Those numbers were false and misleading. As to some brands, Kalder had only entered into pilot programs for Kalder to provide services for a limited time period and typically at a heavily discounted price. Other brands had no agreement with Kalder whatsoever—not even for free services.

7.  Kalder's pitch deck, which GÖKÇE GÜVEN, the defendant, caused to be transmitted to investors and prospective investors, also reported, among other things, that Kalder's recurring revenue had steadily grown month over month since February 2023 and that by March 2024, Kalder had reached $1.2 million in annual recurring revenue. That was false. As GÜVEN well knew, Kalder's revenue had been largely flat over the prior year, and was nowhere near the $1.2 million that GÜVEN had represented. Nor did Kalder have contracts with brand partners that would result in $1.2 million in annual recurring revenue.

8. GÖKÇE GÜVEN, the defendant, concealed the true financial condition of the company from multiple investors by maintaining two sets of books—one internal set containing Kalder's accurate monthly and annual financial information that was prepared by Kalder's outside accounting firm, and a second set with false and inflated numbers that was transmitted to investors and prospective investors.

9. The discrepancies between Kalder's internal financial records and those transmitted to investors and prospective investors were stark. For instance, a purported historical financial statement that GÖKÇE GÜVEN, the defendant, caused to be transmitted to prospective investors reflected that Kalder's revenue had grown month over month from March 2023 to April 2024, with Kalder earning approximately $86,000 in revenue in April 2024. That month's supposed revenue figure was inflated by nearly tenfold; in truth, as GÜVEN knew, Kalder's actual historical financials showed that revenue had been largely flat over the prior year, and Kalder had earned less than $10,000 in revenue in April 2024. Likewise, in or about September 2024, GÜVEN caused to be transmitted to another potential investor an updated historical financial statement showing, falsely, that Kalder's revenue had continued to grow between April 2024 and August 2024, and that Kalder had earned nearly $100,000 in revenue in August 2024. That too was false; as GÜVEN knew, Kalder's actual historical financials showed that August 2024 revenue was approximately $15,000. Indeed, Kalder's actual, internal financials showed that its total revenue for the year 2023 was approximately $50,000, and its total revenue for the year 2024 was approximately $140,000.

10. GÖKÇE GÜVEN, the defendant, also transmitted and caused to be transmitted to prospective investors a forged contract between Kalder and a global Web3 services corporation ("Brand-1"). This forged contract purported to require Brand-1 to pay Kalder a minimum monthly rate of $2,500 per month. In truth, and as GÜVEN knew, while representatives of Kalder and

Brand-1 had engaged in discussions about a potential partnership, no deal was ever struck and no contract was ever signed. To create the forged contract and make it appear as though it has been consummated, GÜVEN added to it the name of and affixed a signature purportedly belonging to a representative of Brand-1. GÜVEN then conveyed the forgery to Kalder's investors and prospective investors as an example of Kalder's existing brand partnerships.

11. Following these false statements, misleading claims, and fabricated documents regarding Kalder's revenue and brand partners, GÖKÇE GÜVEN, the defendant, raised approximately $7 million from more than a dozen investors, who each received equity interests in Kalder. As a result of this seed round, Kalder had an implied valued of approximately $35 million, and GÜVEN's majority stake had an implied value of approximately $18 million.

### GÜVEN's Scheme to Fraudulently Obtain a Visa

12. Beginning in or about 2018, GÖKÇE GÜVEN, the defendant, resided in the United States on a student visa. In or about 2025, as her student visa approached its end, GÜVEN, a citizen of Turkey, sought permission to reside in the United States indefinitely. Specifically, GÜVEN caused Kalder to apply to U.S. immigration authorities for an O-1A visa to be issued to GÜVEN. An O-1A visa is available to individuals with an extraordinary ability in the sciences, education, business or athletics. To enable immigration officers to determine whether a particular individual meets these criteria, United States visa regulations require, among other things, that an applicant provide evidence, including "Affidavits written by present or former employers or recognized experts certifying to the recognition and extraordinary ability . . . ." 8 C.F.R. § 214.2(o)(ii)(A)(1).

13. GÖKÇE GÜVEN, the defendant, initially caused Kalder to apply for an O-1A visa on her behalf in February 2025, as supplemented in June 2025. GÜVEN's application focused on her purportedly extraordinary business ability and included numerous assertions about Kalder's

5

business success and GÜVEN's personal accomplishments. Because the O-1A visa is available only to qualifying persons evincing "extraordinary ability," GÜVEN's assertions about Kalder and about her personal accomplishments addressed the core question presented by the application.

14.     GÖKÇE GÜVEN, the defendant, lied on both fronts. As to Kalder, she repeated in her application similar misrepresentations regarding Kalder as those she previously provided to investors. For instance, and among other things, GÜVEN falsely represented that "Kalder has already generated $1.5 million in revenue." As to her alleged personal accomplishments and skill, the application appended letters from various business leaders touting GÜVEN's success, skill, and fame. One letter purportedly from a senior executive at a financial services technology company ("Executive-1") claimed, among other things, that GÜVEN "represents an exceptional caliber of talent," "[h]er unique ability to integrate product design, loyalty architecture, and financial technology is both rare and critically important," and "it is squarely in the national interest to enable [GÜVEN] to continue her work in the United States." Another letter purportedly from the CEO of a technology company where GÜVEN worked briefly as a student intern ("Executive-2") claimed, among other things, that "[t]he technology [GÜVEN] is building, enabling real-time, card-linked, interoperable rewards, represents a major evolution in consumer infrastructure, and I believe [GÜVEN's] continued work in this field is of national economic benefit." A third letter purportedly from the former chief operating officer ("COO") of the same technology company ("Executive-3") claimed, among other things, that GÜVEN made "extraordinary contributions" to the company that were "instrumental to the company's success and its distinguished reputation." And, a fourth letter purportedly from an executive at another financial services company where GÜVEN also had worked as a student intern ("Executive-4") claimed, among other things, that

GÜVEN had been "instrumental" in the launch of a particular program that had not even existed at the time of GÜVEN's involvement with the company.

15. The letters discussed in the preceding paragraph were forged by GÜVEN. GÜVEN secretly had created an email address in the name of another person ("Individual-3"). She then used that email address to generate DocuSign signatures purportedly from Executive-1, Executive-2, Executive-3, and Executive-4, and digitally affixed them to the letters of support that she caused to be drafted and submitted with her visa application. By using an email address in Individual-3's name, rather than in her own, GÜVEN attempted to conceal her role in the forgeries.

16. Even after these false statements and forgeries, GÖKÇE GÜVEN, the defendant, was not initially successful in obtaining an O-1A visa. However, GÜVEN caused Kalder to reapply for a visa on her behalf, repeating in the second application many of the same false representations from the first application and appending again the forged letters from Executive-1, Executive-2, Executive-3, and Executive-4, among others. GÜVEN was ultimately issued an O-1A visa in the fall of 2025.

## Statutory Allegations

17. From at least in or about 2024 up to and including at least in or about November 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GÜVEN engaged in a scheme to defraud by making materially false and misleading statements to current and prospective investors regarding Kalder's revenue and business partnerships, in connection with the sale of equity shares of Kalder.

(Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

18. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

19. From at least in or about 2024 up to and including at least in or about November 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GÜVEN engaged in a scheme to defraud investors in Kalder by making materially false and misleading statements to current and prospective investors regarding Kalder's revenue and business partnerships in order to obtain money from those investors, and sent and received, and caused others to send and receive, electronic communications and financial wires to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Visa Fraud)

The Grand Jury further charges:

20. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

21. In or about 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly made under oath, and as permitted under penalty of perjury under Title 28, United States Code, Section 1746, knowingly subscribed as true, a false statement with respect to a material fact in an application, affidavit, and other document required by the immigration laws and regulations prescribed thereunder, and knowingly presented such application, affidavit, and other document which contained such false statement and which failed to contain a reasonable basis in law and fact, to wit, GÜVEN caused to be signed and presented to immigration authorities a petition for a O-1A visa that contained false information and evidence to demonstrate her alleged eligibility for the visa, namely materially false statements and forged letters of support.

(Title 18, United States Code, Sections 1546(a) and 2.)

## COUNT FOUR
### (Aggravated Identity Theft)

The Grand Jury further charges:

22. The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

23. In or about 2025, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly transferred, possessed, and used, without lawful authority, a

9

means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, GÜVEN falsified the names and signatures of multiple individuals, including Executive-1, Executive-2, Executive-3, and Executive-4, on forged letters of support submitted in connection with GÜVEN's O-1A visa application, during and in relation to the visa fraud charged in Count Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## COUNT FIVE
### (Aggravated Identity Theft)

The Grand Jury further charges:

24.     The allegations contained in paragraphs 1 through 16 of this Indictment are repeated and realleged as if fully set forth herein.

25.     In or about 2024, in the Southern District of New York and elsewhere, GÖKÇE GÜVEN, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, GÜVEN added the name and falsified the signature of an executive of Brand-1 on a purported contract between Brand-1 and Kalder, during and in relation to the wire fraud charged in Count Two of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## FORFEITURE ALLEGATIONS

26.     As a result of committing the offenses alleged in Counts One and Two of this Indictment, GÖKÇE GÜVEN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency

representing the amount of proceeds traceable to the commission of said offenses, and the following specific property:

  a. Any and all monies, assets, and funds contained in the Mercury checking account bearing account number 202217285146, held in the name of Kalder; and

  b. Any and all monies, assets, and funds contained in the Mercury treasury account bearing account number 8IS-06631-12 RR ZXB, held in the name of Kalder.

  27. As a result of committing the offense alleged in Count Three of this Indictment, GÖKÇE GÜVEN, the defendant, shall forfeit to the United States, pursuant to Title 18 United States Code Section 982(a)(6), all conveyances, including any vessel, vehicle, or aircraft, used in the commission of said offense; all property, real and personal, that constitutes or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense; and all property, real or personal, that was used to facilitate, or was intended to be used to facilitate, the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

  28. If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section

2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

███████████████
FOREPERSON

/s/ Jay Clayton
JAY CLAYTON
United States Attorney