**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 24, 2026

**<u>BY ECF</u>**
Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Gökçe Güven*, S3 25 Cr. 592 (LAK)**

Dear Judge Kaplan:

The Government respectfully submits an additional Victim Impact Statement it has received in advance of sentencing.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Allison C. Nichols
Alexandra N. Rothman
Assistant United States Attorneys
(212) 637-2366/-2580

# Victim Impact Statement No. 8

# Victim Impact Statement

United States v. Gökçe Güven, 25 Cr. 592 (LAK)

---

Hon. Lewis A. Kaplan
Daniel Patrick Moynihan United States Courthouse
500 Pearl St. New York, NY 10007-1312

Your Honor,

I am submitting this statement to describe my experience working at Kalder Inc. under Gökçe Güven, the circumstances surrounding my termination, the misconduct I was directed to participate in, and the retaliation after I refused.

I worked at Kalder for nearly three years. I first began working with Gökçe Güven in June 2023 through Athena, a third-party executive assistant agency, where I was assigned to support her. During that time, I was expected to manage an expanding scope of responsibilities across sales, operations, and executive support, without adequate direction, compensation, or recognition for the work I produced. After approximately a year, I communicated that I intended to leave. Instead of allowing me to go, Gökçe paid $23,500 to Athena to release me from their agency so I could work for Kalder directly. She gave me the title of Operations Lead. She then transferred that same $23,500 into my contract as a personal liability — meaning if I left before 18 months, I owed her the money she had paid to acquire me.

As a manager and leader, I found Gökçe to be highly erratic. She frequently changed the direction of the company and would abruptly alter priorities, operations, and strategies without consistency or transparency. Over time, I began noticing discrepancies between what was being represented internally and externally about Kalder's financial performance and client relationships and what I personally observed operationally.

One incident I specifically recall involved working with a member of the sales team, Caesar (Premchanok Wongchotsathit), on the preparation of an ARR document. During that process, Gökçe directed us to insert specific numbers that did not accurately reflect the company's true performance in order to misrepresent Kalder's financial condition.

Additionally, as part of my responsibilities preparing sales collateral alongside the sales team and Gökçe, I was instructed to include companies within Kalder's sales decks in a way that implied they were active clients or current partners of the company. Later, I discovered that several of these representations were not truthful.

In my role as Operations Lead, I was also instructed to fabricate or alter financial documentation, including invoices. Gökçe would direct me to prepare and send invoices to both existing and prospective clients that included additional fees beyond the agreed-upon amounts. These extra charges were often justified internally as "service fees" or "VIP fees," despite not being part of the original agreements.

I was also directed to participate in conduct intended to circumvent Gökçe's CEO leave while her visa and work authorization matters were unresolved or under review. For months, she instructed me to relay her operational and executive directives to other employees — specifically Chelsea, our CRO and Lindsey on the Marketing team — without informing them that the instructions were coming directly from her. In practice, I was being used as an intermediary so she could continue exercising CEO authority while concealing her involvement.

I also recall being instructed to repeatedly contact Chelsea regarding our CTO, Eric Alford, while he was preparing to undergo a serious planned surgery. Gökçe pressured me to obtain work updates and push for calls regarding company matters despite Eric's medical condition and despite the fact that these actions again involved her continuing to exercise operational CEO responsibilities while supposedly on leave. That experience deeply affected my perception of her leadership and judgment.

My responsibilities extended last summer. I was directed by Gökçe to manage interns, some of whom had traveled from Turkey to work at the Kalder office in New York. These communications did not take place on the company's official systems. Instead I was added to a Turkish WhatsApp group through which Gökçe directed the interns, requiring me to use translation tools to understand instructions I was then expected to implement.

This occurred during the same period when Gökçe herself lacked valid U.S. work authorization. I had no visibility into the work status of the interns I was asked to manage and was never given any information about it.

In the course of my operational role, I observed something I did not fully understand at the time. I observed that Gökçe had hired her sister to work at Kalder — and that her sister had then signed documentation representing that Gökçe herself was employed by the company, as if Kalder were her employer rather than her own company. I later understood this circular arrangement to have been used in connection with Gökçe's immigration authorization. I did not fully understand its significance at the time. I understand it now.

In summer of 2025, ten employees collectively raised concerns regarding Kalder’s financial truthfulness and internal conduct, which ultimately triggered an audit. Shortly after these whistleblower activities and internal concerns escalated, employees involved — including myself — began experiencing retaliation.

Following an all-hands meeting required by Gökçe, employees were threatened via email that failure to attend would result in termination. After that meeting, she repeatedly pressured me to schedule calls involving herself and Noah Doyle. I believed these efforts were intended to discourage or interfere with my participation in whistleblower activities and concerns being raised internally.

When I refused to participate in those calls, she attempted to persuade me to remain loyal to her by offering me a salary increase and a higher position. When those efforts failed, she then threatened that if I did not cooperate with her, I would be forced to reimburse the $23,500 buyout amount she had previously paid to release me from the third-party agency..

I came to Kalder believing I was taking a professional opportunity. What I found was a contract that prevented me from leaving, a clause that would have cost me nearly fifteen months of income if I tried, and a working environment where I was expected to act as an instrument of conduct I knew was wrong. The $23,500 she threatened to enforce was not a standard contractual obligation. It represented the fee she had paid to a third-party agency to secure my exclusive services — a cost she had voluntarily incurred and then transferred into my contract as a personal liability. At my consulting

rate of $1,600 per month, that amount represented nearly fifteen months of gross income. The threat was not just financial pressure. It was a calculated attempt to use a predatory contract provision to silence someone who had witnessed her conduct firsthand. I was not treated as a professional. I was treated as a resource to be controlled. I was expected to figure things out without guidance, execute without support, and produce results without recognition — while a $23,500 obligation ensured I could not easily walk away.

I refused to back down from the concerns I was raising. Shortly afterward, I was terminated without cause and without meaningful severance or fair compensation despite having worked for the company for nearly three years.

The experience caused me significant emotional distress and professional harm. I lost my employment after years of loyalty and after being placed in situations where I was repeatedly directed to engage in conduct I believed was unethical and unlawful. I also experienced fear and pressure for refusing to cooperate in actions I believed were wrong.

What affected me most was witnessing how employees who attempted to raise legitimate concerns were treated. Many of us genuinely believed we were trying to protect the company, its employees, and its stakeholders by speaking honestly about what we were seeing internally. Instead, we were met with intimidation, retaliation, pressure, and termination.

I was hired to support a company I believed in. I was not just a witness to what happened at Kalder. I was used as a tool to execute it,  fabricating financial documents, relaying directives from a CEO who was supposed to be on leave due to visa expiry, preparing materials that misrepresented the company to investors and clients. I did not fully understand at the time what I was participating in. When I did understand, I refused to continue. I was terminated for that refusal.

I respectfully ask the Court to consider the experiences of employees like myself who were placed in ethically compromising situations, pressured into participating in misleading conduct, and ultimately terminated after raising concerns.

Looking back, the structure of my employment was not accidental. I was acquired through a financial arrangement that was immediately transferred to me as a personal liability. I was given expanding responsibilities without support, compensation, or recognition — which made me dependent on the role I could not afford to leave. I was placed in the middle of conduct I did not fully understand, which made me complicit before I knew enough to refuse. And when I finally did refuse, the financial trap that had been set on day one was the first weapon she reached for. None of this was coincidental. It was calculated, deliberate, and sustained control, and designed to ensure I would comply because I could not easily leave.

Respectfully submitted,
Audrey Basa